**NORTHERN COLORADO WATER CONSERVANCY DISTRICT, a quasi-municipal entity and political subdivision of the State of Colorado, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 07–637C.

United States Court of Federal Claims.

July 31, 2009.

638

Bennett W. Raley, Trout, Raley, Montaño, Witwer & Freeman, P.C., Denver, Colorado, for plaintiff. With him on the briefs were Robert V. Trout and Peggy E. Montaño, Trout, Raley, Montaño, Witwer & Freeman, P.C., Denver, Colorado.

Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Michael F. Hertz, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were John C. Chaffin and M. Rodney Smith, Attorney-Advisors, United States Department of the Interior, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case stems from a contract entered by the Northern Colorado Water Conservancy District ("Northern Colorado") with the United States Department of the Interior, Bureau of Reclamation ("Bureau"), for the development of the Colorado–Big Thompson Project ("Colorado–Big Thompson" or "the Project"), a multi-purpose water project in Colorado that stores, regulates, and diverts water for irrigation, domestic uses, and power production. Northern Colorado is an irrigation district that transports both project and non-project water through facilities provided by the Project. Essentially, Colorado–Big Thompson moves water across the Continental Divide from west to east and serves farms, ranches, and cities such as Boulder and Loveland on the eastern side of the divide. Hr'g Tr. 6:20–24, 7:8–10, 8:15–21.[1]

Northern Colorado has filed a motion for summary judgment in which it seeks a declaration that Article 22 of its contract with the Department of the Interior is enforceable. Pl.'s Mot. for Summary Judgment at 2 ("Pl.'s Mot."). Article 22 of Northern Colorado's contract with the Bureau addresses "Disposition of Miscellaneous Revenues" and provides for sharing of such revenues between the government and Northern Colorado, except that "all revenues derived from carriage of other than project water through the Continental Divide Tunnel shall be the property of [Northern Colorado]." Pl.'s Ex. A at 28–29 (Contract No. 9–07–70–W0020 Article 22 (July 5, 1938)) ("Implementing Contract" or "Contract").[2] Northern Colorado seeks to enjoin the Bureau of Reclamation from disregarding Article 22 of this Contract in the future, and to require the Bureau to credit to Northern Colorado all revenues allegedly currently due to Northern Colorado under Article 22 of the Contract. Pl.'s Mot. at 2. The government has responded with a cross-motion for summary judgment, seeking judgment as a matter of law in its favor. Def.'s Opp'n to Pl.'s Mot. for Summary Judgment and Cross–Mot. for Summary Judgment at 1 ("Def.'s Cross–Mot."). The government argues that the provisions of Article 22 requiring sharing of revenues are neither valid nor enforceable, due to various limitations on the Bureau's authority to enter into such a contract. Id. at 12–13.

---

1. "Pl.'s Ex. —— at ——" refers to the exhibits attached as an appendix to plaintiff's motion for summary judgment, followed by the pagination within plaintiff's appendix. Correspondingly, "Def.'s App. at ——" refers to the pagination within the government's appendix to its cross-motion for summary judgment. "Hr'g Tr. ——" refers to the transcript of the hearing held in this case on May 5, 2009.

2. The Implementing Contract was formerly numbered I1r–1051. See Pl.'s Mot. at 4.

A hearing on the pending cross-motions for summary judgment was held on May 5, 2009, and the cross-motions are ready for disposition.

## BACKGROUND[3]

### A. Authorizing Legislation

The Reclamation Act of 1902, Pub.L. No. 57–161, 32 Stat. 388 (1902), as amended and supplemented by the laws generally styled "federal reclamation law," 43 U.S.C. § 371 *et seq.,*[4] initiated a nationwide "program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands" in various states of the western United States. *Orff v. United States,* 545 U.S. 596, 598, 125 S.Ct. 2606, 162 L.Ed.2d 544 (2005) (citing *California v. United States,* 438 U.S. 645, 650, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978)); *see Nevada v. United States,* 463 U.S. 110, 115, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) ("Th[e] Act directed the Secretary of the Interior to withdraw from public entry arid lands in specified western [s]tates, reclaim the lands through irrigation projects, and then to restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself."). To this purpose, the Reclamation Act created a reclamation fund to finance the construction and maintenance of reservoirs and other irrigation works, *see* Reclamation Act of 1902, § 1, 32 Stat. at 388 (codified, as amended, at 43 U.S.C. § 391), and granted the Secretary of the Interior the authority to construct such works. *Id.* § 2, 32 Stat. at 388 (codified, as amended, at 43 U.S.C. § 411). In addition, the Reclamation Act stated "[t]hat the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the [g]overnment until otherwise provided by Congress." *Id.* § 6, 32 Stat. at 389 (codified at 43 U.S.C. § 498).

Congress subsequently granted the Secretary of the Interior the authority to enter into contracts with irrigation districts whereby the districts would pay the cost of constructing and operating water projects. Act of May 25, 1926, Pub.L. No. 69–284, § 46, 44 Stat. 636, 649 (codified, as amended, at 43 U.S.C. § 423e) ("No water shall be delivered upon the completion of any new project ... until a contract ... in form approved by the Secretary of the Interior shall have been made with an irrigation district ... providing for payment by the district ... of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States.").

Thereafter, pursuant to the Interior Department Appropriation Act of 1938, Pub.L. 75–249, 50 Stat. 564, 595 (1937), Congress authorized the construction of the Colorado–Big Thompson Project. *Id.; see* Agreed–Upon Statement of The Case and Stipulation of Facts ¶ 7 ("Stip."). "The Colorado–Big Thompson Project is a major reclamation project that brings water from the headwaters of the Colorado River underneath the Continent[al] Divide through a tunnel for use in the front range of Colorado." Hr'g Tr. 6:20–24. Congress initially appropriated $900,000 for the Project, with the proviso "[t]hat no construction [on the Project] shall be commenced until the repayment of all costs of the [P]roject shall, in the opinion of the Secretary of the Interior, be assured by appropriated [*sic* ] contracts with water conservancy districts, or irrigation districts or water users' associations organized under the laws of Colorado, or other form of organization satisfactory to the Secretary of the Interior." Interior Department Appropriation Act of 1938, 50 Stat. at 595.

In the Appropriation Act, Congress stated that the Colorado–Big Thompson Project would be constructed "in accordance with the plan described in Senate Document Number[ ] 80." Interior Department Appropriation Act of 1938, 50 Stat. at 595. This Senate

---

**3.** The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and exhibits and are either undisputed or alleged and assumed to be true for purposes of the pending motions.

**4.** The Reclamation Act of 1902 is also known as the National Irrigation Act of 1902. *See* 43 U.S.C. § 371 historical and statutory notes.

document provided a construction plan and cost estimates for the Project. Def.'s App. at 1 (S. Doc. No. 75–80 (1937)). Regarding the construction plan, the Senate document described the Project as "contemplat[ing] the diversion of surplus waters from the headwaters of the Colorado River on the Pacific or western slope to lands in northeastern Colorado on the Atlantic or eastern slope greatly in need of supplemental irrigation water." Def.'s App. at 5 (S.Doc. No. 75–80). In a discussion of how the Project would be financed, the Senate document addressed expected costs and repayment plans for irrigation and power projects, *see id.* at 27–37, but did not deal with the sharing of incidental revenues.

### B. Formation of the Northern Colorado Water Conservancy District

Northern Colorado was established following the enactment of the Water Conservancy Act, Colo.Rev.Stat. §§ 37–45–101 *et seq.* (1937), by the Colorado legislature. *See* Stip. ¶ 1; Hr'g Tr. 8:3–9. The purpose of the Colorado Water Conservancy Act "was [ ] to assist communities in financing water projects for [agricultural] irrigation, conservation, and other public purposes." *Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy Dist.,* 739 F.2d 1472, 1474 (10th Cir.1984). As Colorado courts recognized in interpreting this state law, "neither the resources of the farmers nor the facilities of private capital were able to finance the major irrigation projects commonly involving great dams, tunnels and extensive diversion works.... [B]y the construction of adequate water storage and diversion systems, water may be carried from regions within our state having a surplus to those suffering from the lack of a sufficient supply and by this process our statewide water supply made to do full duty before flowing from our borders." *People ex rel. Rogers v. Letford,* 102 Colo. 284, 79 P.2d 274, 281 (1938). Accordingly, Northern Colorado was set up to exercise authority as a quasi-municipal water conservancy district under this state law. Stip. ¶ 1. Northern Colorado's authority under Colorado law "extends to providing both irrigation water and water for municipal purposes." Hr'g Tr. 7:17–19; *see also* Hr'g Tr. 9:9–16 (averring that cur-

rently approximately sixty percent of the water controlled by Northern Colorado is allocated for municipal use, and forty percent is allocated to irrigation). Northern Colorado's service area in Colorado is demarcated on the west by a line from Broomfield north to Fort Collins, and on the east by the Nebraska state border. Hr'g Tr. 8:18–21.

### C. Contract Between the Bureau of Reclamation and Northern Colorado

On July 5, 1938, pursuant to the Interior Department Appropriation Act of 1938 and the Reclamation Act of 1902 and subsequently enacted federal reclamation law, 43 U.S.C. § 371 *et seq.,* Northern Colorado entered into a contract with the Department of the Interior entitled "Contract Between the United States and the Northern Colorado Water Conservancy District Providing for the Construction of the Colorado–Big Thompson Project, Colorado." Pl.'s Ex. A at 3 (Implementing Contract); Stip. ¶ 5. This Contract satisfied the condition precedent in the authorizing statute for the Project that "no construction shall be commenced until the repayment of all costs ... shall ... be assured by appropriate[ ] contracts with water conservancy districts." Interior Department Appropriation Act of 1938, 50 Stat. at 595. Through the Implementing Contract, the United States outlined its proposal to use the Colorado–Big Thompson Project "for the storage, diversion[,] and beneficial use of the waters of the Colorado and the Big Thompson rivers and their tributaries for irrigation, power, domestic[,] and other purposes." Pl.'s Ex. A at 3 (Implementing Contract Article 2). In turn, Northern Colorado agreed to supply water from these rivers and tributaries "for irrigation and domestic uses, for which it will be obligated to repay to the United States a part of the cost of such project." *Id.* The Contract specified that the "total obligation of [Northern Colorado to the United States] under this contract for construction" would not exceed $25,000,000, *id.* at 10 (Implementing Contract Article 5), and that in exchange, Northern Colorado would receive "the perpetual rights to use all water, excluding water made available by the Green Mountain Reservoir and the water rights

reserved in Articles 24 and 25 hereof, that becomes available through the construction and operation of this project, for irrigation, domestic, municipal, and industrial purposes, but excluding any and all uses for power." *Id.* at 23 (Implementing Contract Article 16). Other provisions in the contract allocated a variety of rights and obligations between the parties regarding the operation and maintenance of Project works, *see, e.g., id.* at 13–16 (Implementing Contract Articles 8–9), the means by which excess revenues were to be credited to Northern Colorado, *id.* at 22–23 (Implementing Contract Article 15), the distribution of water by Northern Colorado, *id.* at 17 (Implementing Contract Article 17), the United States' exclusive control of power-generation facilities and revenues, *id.* at 24–25 (Implementing Contract Article 18), seepage and return flows, *id.* at 25–26 (Implementing Contract Article 19), and other aspects of construction and distribution. In accord with the authorizing legislation, the Contract specified that "[t]itle to all of the works constructed by the United States under this contract shall be in and remain in the name of the United States until otherwise provided for by Congress." *Id.* at 36 (Implementing Contract Article 37); *see* Hr'g Tr. 17:24 to 18:11.

Through the years, various parts of the Implementing Contract have been amended and supplemented; however, the language in Article 22 has remained unchanged. Stip. ¶ 10. That Article, captioned "Disposition of Miscellaneous Revenues," states that

> [m]iscellaneous revenues arising out of use of project works facilities and other properties, subject to Article 18, shall be credited to the cost of construction of the project until such time as the final determination of construction costs has been made by the Secretary as provided in Article 6, and thereafter shall be credited equally to [Northern Colorado] and the United States; provided, however, that all revenues derived from the carriage of other than project water through the Continental Divide Tunnel shall be the property of [Northern Colorado].

Pl.'s Ex. A at 28–29 (Implementing Contract Article 22); *see* Stip. ¶ 10. Article 22 of the contract does not specify what types of non-project water can be transported through Project facilities, nor does it control how miscellaneous or incidental revenues from the carriage of non-project water are calculated. *See* Pl.'s Ex. A at 28–29 (Implementing Contract Article 22). The Implementing Contract contemplated that the Project would deliver an annual average of 310,000 acre-feet of water into the St. Vrain, Little and Big Thompson, and Poudre Rivers to benefit users on the eastern slope of the Continental Divide. *See* Pl.'s Ex. A at 9 (Implementing Contract Article 4). However, because the average annual historic yield from these sources has only been 230,000 acre-feet of water, excess capacity has existed within the system. Such excess capacity has been available to transport and distribute non-project water in the same manner that Project water is transported and distributed. *See* Hr'g Tr. 11:10–14. As a result, several later long-term contracts associated with Colorado–Big Thompson, along with agency regulations, established a framework for the transportation of this non-project water and to account for the associated charges. *See infra,* at 642–45.

### D. Experience with the Implementing Contract

The Bureau, which "exercises general contracting authority to carry out and secure repayment arrangements for construction costs of projects under federal [r]eclamation law," is the administrator of the Implementing Contract. Stip. ¶¶ 4, 6. Following the formation of the contract, the Colorado–Big Thompson Project was constructed between 1938 and 1956. Stip. ¶ 8. Together, Northern Colorado and the Bureau jointly operate various features of the Project. Stip. ¶ 6. The Project includes "a transmountain diversion feature that diverts water from the headwaters of the Colorado River to northeastern Colorado," thus irrigating farmland and supplying supplemental water to cities and towns in Colorado. Stip. ¶ 8. This diversion of water was accomplished through the construction of the Continental Divide Tunnel, later renamed the Alva B. Adams Tunnel, a 13–mile facility linking the western slope of

the Continental Divide with the eastern slope. *See* Stip. ¶ 11, Hr'g Tr. 6:20–24.

Pursuant to Northern Colorado's contractual agreement to repay a portion of the construction costs of the Project over the course of forty years, *see* Pl.'s Ex. A at 10–11 (Implementing Contract Article 6), any of the "miscellaneous revenues" within the meaning of Article 22, except for power plant revenues subject to Article 18, should have been "credited to the cost of construction of the project." Pl.'s Ex. A at 28 (Implementing Contract Article 22). The Secretary of the Interior made a final determination of the cost of construction prior to 1978, and thereafter, Northern Colorado completed all repayments for construction costs that were due under the Contract. Stip. ¶ 12. Subsequently, under the terms of the Implementing Contract, any of the "miscellaneous revenues" described in Article 22, excepting those from power plant facilities identified in Article 18, should have been "credited equally to [Northern Colorado] and the United States," except "that all revenues derived from the carriage of other than project water through the Continental Divide Tunnel" should have belonged to and have been payable to Northern Colorado. Pl.'s Ex. A at 28–29 (Implementing Contract Article 22).

This treatment of miscellaneous revenues was honored at various times prior to 2001. Stip. ¶ 13. In 1967, 1969, and 1971, the Bureau of Reclamation prepared an annual Bill for Collection of Northern Colorado's construction costs, which for each year stated "[m]iscellaneous revenues credited under Art. 22 of Contract I1r–1051 for F[iscal] Y[ear]." Pl.'s Ex. K at 262 (1967 Bill for Collection) (crediting $167.50 in miscellaneous revenues against the cost of construction), *id.* at 263 (1969 Bill for Collection) (crediting $17.50), *id.* at 264 (1971 Bill for Collection) (crediting $194.77); *see* Stip. ¶ 13.

In 1990, the Bureau of Reclamation, Northern Colorado, and a municipal subdistrict created by Northern Colorado to provide service to cities, *see* Hr'g Tr. 11:4–9, entered into a contract entitled "Amendatory Contract for the Introduction, Storage, Carriage[,] and Delivery of Water" ("Windy Gap Contract"). Pl.'s Ex. X at 391 (Windy Gap

Contract, Contract No. 4–07–70–W0107 (Mar. 1, 1990)); *see* Stip. ¶ 14. This contract made use of excess capacity in Project facilities, providing for the carriage and delivery of non-project water from the western slope through the Adams Tunnel to Project facilities on the eastern slope. *See* Pl.'s Ex. X at 393–94 (Windy Gap Contract) (stating the United States' willingness to "provide the use of Project facilities for the introduction, storage, carriage[,] and delivery" of an independent water supply). The contract further stipulated:

> Notwithstanding any provisions to the contrary as set out in Contract No[.] 9–07–70–W0020 [the Implementing Contract], as amended and supplemented, between the United States and [Northern Colorado], one-half of the revenues received by the United States under Article 7(d) hereof shall be credited by the United States to [Northern Colorado]'s annual obligation to the United States under said Contract No[.] 9–07–70–W0020 on account of the costs of operation and maintenance of [j]oint [w]orks of the Project [s]ystem. In addition, one half of all revenues received by [Northern Colorado] pursuant to Article 8(d) hereof shall be credited to the United States['] obligations to [Northern Colorado] in accordance with Contract No. 9–07–70–W0020, as amended and supplemented. All other revenues arising out of this contract, including, among others, those accruing from power generation derived from use of Subdistrict Water, but excluding those arising pursuant to Article 8(a), (b), (c), (d), and (e) hereof, shall become the sole property of the United States.

Pl.'s Ex. X at 409 (Windy Gap Contract Article 9). In short, one-half of the revenues received by the United States for "operation and maintenance costs" under Article 7(d) were credited to Northern Colorado, and one-half of Northern Colorado's revenues for the same under Article 8(d) were credited to the United States. *See id.* The Windy Gap Contract also included a provision granting revenues from "[a]n Adams Tunnel conveyance charge," along with other administrative and service charges, solely to Northern Colo-

rado. *See id.* at 407–08 (Windy Gap Contract Article 8). The United States has performed all of the obligations listed under the Windy Gap Contract, including the crediting of operation and maintenance revenues to Northern Colorado. *See* Stip. ¶ 15.

In addition, between 1991 and 2001, the Bureau of Reclamation and Northern Colorado entered into eleven temporary carriage contracts for non-project water with the City of Loveland, Colorado. Pl.'s Exs. L–V (Temporary Water Conveyance Contracts, City of Loveland); *see* Stip. ¶ 16. These contracts all contained the following provision:

> Notwithstanding any provisions to the contrary as set out in Contract No[.] 9–07–70–W0020, as amended and supplemented, between the United States and [Northern Colorado], one-half of the revenues received by the United States from the Hansen Canal O[peration] & M[aintenance] component and one-half [of] the construction component of the Hansen Canal will be credited by the United States to [Northern Colorado]'s annual obligation to the United States under the Contract No[.] 9–07–70–W0020.

*See, e.g.,* Pl.'s Ex. M at 280 (Temporary Water Conveyance Contract, Contract No. 2–07–60–W0813 Article 3(b) (Apr. 7, 1992)).

However, during this time, the Bureau of Reclamation was in the process of reviewing its procedures for collecting and crediting revenues with respect to various projects and repayment contracts. *See* Def.'s Cross–Mot. at 7. In December 1992, with the stated purpose of attempting to bring its practices into compliance with applicable revenue-disposition law, the Bureau issued a notice in the Federal Register advising "water districts that inappropriate direct (front end) crediting of revenues will be discontinued effective January 1, 1994." Management of Revenues from Reclamation Projects and Project Lands, 57 Fed.Reg. 62,580, 62,580 (Dec. 31, 1992). The Bureau commented that front end or direct credit

> is used to satisfy a water users' current construction payment. Any revenues in excess of the annual construction payment are to be applied against the annual operation and maintenance expenses of the dis-

trict. This type of crediting assists the water user or district in meeting current obligations rather than accelerating the repayment of the construction obligation, and applies to only a limited number of contracts written prior to 1938.

*Id.* Although the Bureau eventually issued an advance notice of proposed rulemaking on this topic, *see* Revenues Management, 59 Fed.Reg. 40, 41 (proposed Jan. 3, 1994), the Department opted not to engage in a full rulemaking procedure, and instead sought to implement new revenue-disposition policies through directives and other guidance published in the Bureau's Reclamation Manual. *See* Pl.'s Ex. CC at 483 (Reclamation Manual at PEC 03–01, Directives and Standards for Crediting of Incidental Revenues); Pl.'s Ex. BB at 462, 465–66 (Reclamation Manual at WTR P04, Policy for Use of Excess Capacity in Reclamation Projects for the Impoundment, Storage, and Carriage of Non–Project Water). In its policy for use of excess capacity for non-project water, regarding "[r]evenues generated from the charges assessed ... for the use of excess capacity," the Bureau stated that "revenues received by Reclamation from the charges assessed will be covered into the Reclamation Fund, and will not be credited to the project involved." Pl.'s Ex. BB at 465 (Reclamation Manual at WTR P04 § 5(G)(1)). Similarly, the Bureau's directive for the crediting of incidental revenues stated that "[r]evenues received from the incidental use of Reclamation project lands and facilities are [f]ederal moneys and are not the property of water districts, power entities, municipalities, or individuals." Pl.'s Ex. CC at 487 (Reclamation Manual at PEC 03–01 § 1(C)).

In 2000, Congress passed the Energy And Water Development Appropriations Act of 2001, which specifically authorized the Secretary of the Interior to enter into contracts with the City of Loveland for:

> (1) the impounding, storage, and carriage of nonproject water originating on the eastern slope of the Rocky Mountains for domestic, municipal, industrial, and other beneficial purposes; and

> (2) the exchange of water originating on the eastern slope of the Rocky Mountains

for the purposes specified in paragraph (1), using facilities associated with the Colorado–Big Thompson Project, Colorado.

Pub.L. No. 106–377, § 208, 144 Stat. 1441 (2000). Thereafter, when the parties and the City of Loveland sought to alter their temporary contractual relationship into a long-term contractual relationship for the carriage of non-project water, a dispute arose over the allocation of miscellaneous revenues. *See* Def.'s Cross–Mot. at 10. On September 30, 2001, the Bureau, Northern Colorado, and Loveland executed the "Contract ... for Conveyance of Nonproject Municipal and Industrial Water Through the Facilities of the Colorado–Big Thompson Project" ("Loveland Carriage Contract"). Pl.'s Ex. C at 116 (Loveland Carriage Contract, Contract No. 01WR6C0252 (Sept. 30, 2001)); *see* Stip. ¶¶ 17–18. The contract was made "pursuant to Section 208 of H.R. 5483, as incorporated by reference in Public Law 106–377 ..., the Act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof and supplementary thereto, and the [Warren] Act of February 21, 1911 [, Pub.L. No. 61–406] (36 Stat. 925) [ (codified at 43 U.S.C. §§ 523–25) [5]], all collectively referred to as the Federal Reclamation Laws." Pl.'s Ex. C at 116 (Loveland Carriage Contract).

As with the earlier contracts, the Loveland Carriage Contract provides for the conveyance of non-project water through the eastern slope facilities of the Colorado–Big Thompson Project, and requires payment for "a portion of the cost incurred in the construction of Project facilities and a share of O[peration,] M[aintenance,] & R[eplacement] costs for use of those facilities." Pl.'s Ex. C at 118 (Loveland Carriage Contract Article 2); *see* Stip. ¶¶ 17, 19. With respect to these payment obligations, the Loveland Carriage Contract states that

> [Loveland's Water] Enterprise shall make, on behalf of the City, an annual payment per acre-foot of contracted conveyance of Nonproject Water ... which ... shall consist of ... (1)[a] charge for construction cost of the facilities, including interest dur-

ing construction and interest on the remaining balance. This construction cost component shall be $8.08 per acre-foot of conveyance and shall remain fixed for the term of the contract. These charges will be credited in accordance with the Act of February 21, 1911.

Pl.'s Ex. C at 119 (Loveland Carriage Contract Article 5.a). However, as to the crediting of the city's payment against the cost of the construction of the facilities, the parties were not able to reach agreement regarding a revenue-sharing arrangement:

> [Northern Colorado] and the Bureau of Reclamation do not agree regarding the crediting of the payment by the [City's Water] Enterprise, on behalf of the City, for the construction cost of the facilities, set at $8.08 per acre-foot conveyed, as provided for in paragraph 5.a.(1) above (the "Construction Payment"). In order to allow this contract to be executed by all parties and implemented at the earliest possible date, [Northern Colorado] agrees to having the Construction Payment credited to the United States in accordance with the [Warren] Act of February 21,1911 (hereinafter referred to as the "District's Agreement"). However, all parties agree that [Northern Colorado]'s Agreement does not in any way waive or prejudice [its] right or ability to seek and obtain a federal administrative, legislative[,] or judicial determination of this issue. Finally, the United States agrees that, in the event that a final administrative or judicial decision, or Act of Congress, determines or directs that the Construction Payment should be credited in a manner different than that provided in Article 5.a.(1) above, this contract shall provide for crediting of the Construction Payment in accordance with such determination.

Pl.'s Ex. C at 121 (Loveland Carriage Contract Article 5.e); *see* Stip. ¶ 20. Under this provision, the parties agreed that miscellaneous revenues from carriage of excess capacity water would be deposited in the Bureau of

---

**5.** The Warren Act, 43 U.S.C. § 525, provides that "[t]he money received in pursuance of the contracts authorized by [S]ections 523 and 524 of this title shall be covered into the reclamation fund and be available for use under the terms of the [R]eclamation Act and the Acts amendatory thereof or supplementary thereto." 43 U.S.C. § 525.

Reclamation's account within the Treasury, but that this credit would not be specifically reserved for the Colorado–Big Thompson Project or any other particular project of the Bureau. *See id.; see also* M–36969, Proper Disbursement & Crediting of Mineral Leasing Revenues from Reclamation Acquired Lands, 97 I.D. 54 (Sept. 8, 1989).

Subsequent to the Loveland Carriage Contract, Northern Colorado and the Bureau entered six additional temporary contracts for carriage of water in Project facilities—a temporary carriage contract with Loveland, a temporary carriage contract with the Water Supply and Storage Company, and four temporary carriage contracts with the Town of Berthoud—each of which contains a provision that is substantially identical to Article 5.e of the Loveland Carriage Contract. Stip. ¶ 21; *see, e.g.,* Pl.'s Ex. H at 222 (Berthoud Temporary Carriage Contract, Contract No. 04XX6C0081 (Apr. 29, 2004) Article 4.f). Similarly, on March 23, 2007, Northern Colorado and the Bureau entered into a long-term contract with the Town of Berthoud, in which the parties again disagreed about the crediting of miscellaneous revenues:

> [Northern Colorado] and the [Bureau of Reclamation] do not agree regarding the crediting of the excess capacity service charge for capitalized costs of Project facilities, set at $29.82 per acre-foot, as provided for in Article 5.a.(1). In order to allow this Contract to be executed by all Parties and implemented at the earliest possible date, [Northern Colorado] agrees to have the excess capacity service charge for capitalized costs of Project facilities credited to the Reclamation Fund without a credit to the Project or Project contractors as provided for in the Department of the Interior Appropriation Act of May 9, 1938 (43 U.S.C. 392a). However, all Parties agree that [Northern Colorado]'s agreement does not in any way waive or prejudice [its] right or ability to seek and obtain a federal administrative, legislative[,] or judicial determination of this issue. Finally, the United States agrees that, in the event that a final administrative or judicial decision, or Act of Congress, determines or directs that the excess capacity charge for capitalized costs of the Project facilities

should be credited in a manner different than that provided in Article 5.a.(1), this Contract shall provide for crediting of the excess capacity service charge for capitalized costs of the Project facilities in accordance with such determination.

Pl.'s Ex. D at 143–44 (Berthoud Carriage Contract, Contract No. 06XX6C0122 (Mar. 2007) Article 5.c); *see* Stip. ¶ 23. Again, the parties were unable to reach agreement concerning excess-capacity charges for the transportation and storage of the non-project water held by the city, and agreed to temporarily deposit miscellaneous revenues into the Treasury but to preserve the issue for future adjudication. *See* Pl.'s Ex. D at 143–44 (Berthoud Carriage Contract Article 5.c).

On August 28, 2007, Northern Colorado filed a complaint in this court, alleging that the Bureau and the Department of the Interior had breached the Implementing Contract. Compl. ¶ 1. Subsequent proceedings in the case led to the submission of the cross-motions now at issue before the court.

## STANDARDS FOR DECISION

Summary judgment is appropriate when the record indicates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c)(1) of the Rules of the Court of Federal Claims ("RCFC"). The moving party bears the burden of demonstrating that no genuine issues of material fact exist. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To resist such a motion, the non-moving party must offer " 'an evidentiary conflict created on the record at least by a counter statement of fact or facts set forth in detail.' " *Processed Plastics Co. v. United States,* 473 F.3d 1164, 1170 (Fed.Cir.2006) (quoting *Barmag Barmer Maschinenfabrik AG. v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir. 1984)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no rational trier of fact could find for the non-moving party, a genuine issue of material

fact does not exist and the motion for summary judgment may be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When parties have filed cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). To the extent there is a genuine issue of material fact, "both motions must be denied." *Marriott Int'l Resorts, L.P. v. United States*, 83 Fed.Cl. 291, 297 (2008) (citing *Mingus Constructors*, 812 F.2d at 1391).

## ANALYSIS

### I. THE GOVERNMENT'S CONSTITUTIONAL ARGUMENT

The government opens its arguments by contending that "Article 22 [of the Implementing Contract] is unenforceable because it conflicts with constitutional provisions." Def.'s Cross–Mot. at 14 (capitals omitted). In taking the position that a provision of one of its own contracts is constitutionally invalid, the government cites to the Property Clause, U.S. Const. art. IV, § 3, cl. 2,[6] and to the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7.[7] Def.'s Cross–Mot. at 14, 17. The government's argument starts from the premise that the government has title to the Colorado–Big Thompson facilities; then proceeds to the postulate that any revenues from federal property, *i.e.*, property to which the government has title, belong to the government; and then recites the further postulate that only Congress can dispose of federal property either by grant under the Property Clause or by appropriation under the Appropriations Clause. *Id.* at 16–17.

Northern Colorado responds that the government's "assertion that Article 22 'conflicts with [c]onstitutional provisions' ... is ... irrelevant to the real question before the court." Pl.'s Reply at 5. In Northern Colorado's view, "[t]here is no question that federal monies that are federal property and which have been deposited in the federal Treasury are within the control of Congress and subject to the Appropriations Clause." *Id.* However, Northern Colorado contends that Congress has acted by passing a series of laws that bear on the Colorado–Big Thompson Project, and, as a result, a determination of whether miscellaneous revenues subject to Article 22 are federal property turns on federal statutory law, and is not aided by citation to the Property and Appropriations Clauses. *Id.*

The government elaborates on its constitutional arguments by reciting and referring to the Interior Department Appropriation Act of 1938, the enabling legislation for the Colorado–Big Thompson Project, and to the Hayden–O'Mahoney Amendment enacted as part of the Interior Department Appropriation Act of 1939, Pub.L. No. 75–497, 52 Stat. 291, 322 (May 9, 1938) (codified at 43 U.S.C. § 392a). It contends that the Interior Department Appropriation Act of 1938 "did not expressly authorize the sharing of [f]ederal revenues derived from a [f]ederally owned facility" and "cannot be read as impliedly authorizing sharing of [f]ederal revenues." Def.'s Reply at 2. Second, the government avers that "the revenue sharing provisions of Article 22 are in direct violation of the Hayden–O'Mahoney Amendment, 43 U.S.C. § 392a, which ... directs that '[a]ll moneys received by the United States in connection [with] any irrigation projects' shall be deposited into the United States Treasury's Reclamation Fund." Def.'s Reply at 2 (quoting 43 U.S.C. § 392a). For these reasons, argues the government, the Bureau "overstepped its authority when it agreed to Article 22," and "even the plain language of Article 22 cannot override its constitutional and statutory infirmity." Def.'s Cross–Mot. at 12. Further-

---

**6.** The Property Clause provides that "Congress shall have [p]ower to dispose of and make all needful [r]ules and [r]egulations respecting the [t]erritory or the [p]roperty belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

**7.** The Appropriations Clause states: "No money shall be drawn from the Treasury, but in [c]onsequence of [a]ppropriations made by [l]aw." U.S. Const. art. I, § 9, cl. 7.

more, the government avers that Northern Colorado, as a matter of law, "assumed the risk of correctly ascertaining the authority of [g]overnment agents with whom it dealt." *Id.* at 12–13 (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Northern Colorado responds that "Article 22 revenues at issue here are either beyond the scope of the Property Clause, or Congress has authorized the Secretary of the Interior to allocate this property to Northern [Colorado]." Pl.'s Reply at 4.

Based upon the Reclamation Act of 1902, which "[p]rovided [t]hat the title to and the management and operation of the reservoirs and works necessary to their protection and operation shall remain in the [g]overnment until otherwise provided by Congress," § 6, 32 Stat. at 389 (codified at 43 U.S.C. § 498), Northern Colorado acknowledges that the government holds title to the Colorado–Big Thompson facilities. Hr'g Tr. 16:22–25. But, as Northern Colorado would have it, the vesting in the government of "the title to and the management and operation of the reservoirs and works necessary to their protection and operation," 43 U.S.C. § 498, did not create any property rights in the government for the miscellaneous revenues generated by the carriage of non-project water through those works. Pl.'s Reply at 11. Rather, argues Northern Colorado, the Implementing Contract provided the sole source of these property rights in miscellaneous revenues. *Id.* at 7. Northern Colorado thus contends that the rights to miscellaneous revenues under Article 22 belonged to Northern Colorado "from the beginning." *Id.*

Both parties skirt the fact that they share responsibilities and obligations regarding the Colorado–Big Thompson Project. Notably, the fact that the federal government has title to the facilities does not necessarily imply a federal status to all of the revenues generated from the carriage of water, especially non-project water, within those facilities. Rather, there is a decidedly mixed status regard-

ing the facilities themselves. A non-federal entity, Northern Colorado, through its required repayment of a part of the federal government's capital costs, albeit on an interest-free basis over a period of years, has acquired some rights. Moreover, Northern Colorado has management and operating responsibilities for some aspects of the facilities.[8] At the same time, Congress has the power to determine how revenues arising from the Colorado–Big Thompson facilities will be allocated. The pertinent question thus becomes one of how Congress has allocated the responsibilities and associated revenues between the parties to the Implementing Contract, which was statutorily required to be entered before construction on the Project could begin.

## II. THE REQUIREMENT OF AUTHORITY TO BIND THE GOVERNMENT IN CONTRACT

 In essence, the government's constitutional arguments are subsumed in the hornbook-law requirement that to enter into an enforceable contract, an official purporting to act on behalf of the government must have "actual authority to bind the government in contract." *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir. 1990) (citations and internal quotations omitted); *Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984). Such authority may be express or implied. *See H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989). It is the burden of Northern Colorado, as plaintiff, to establish that Oscar L. Chapman, the Assistant Secretary of the Interior who entered the Implementing Contract on July 5, 1938, on behalf of the government, *see* Pl.'s Ex. A at 3, 39 (Implementing Contract), had the requisite authority to do so. *See Heckler v. Community Health Serv. of Crawford County*, 467 U.S. 51, 63, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *see also Federal Crop Ins. Corp.*, 332 U.S. at 384, 68 S.Ct. 1 ("[A]nyone entering into an arrangement with the [g]overnment takes the risk of

---

**8.** As part of its role in transporting water through Project facilities, Northern Colorado operates and maintains various supply canals, pumping plants, and conduits, *see* Pl.'s Ex. A at 13 (Implementing Contract Article 8(b)-(c)), and

bears either all or an equal portion of the costs of operating, maintaining, repairing, and replacing those works. *Id.* at 15 (Implementing Contract Article 9(b)-(c)), 18 (Implementing Contract Article 12).

having accurately ascertained that he who purports to act for the [g]overnment stays within the bounds of his authority."). Limitations on the scope of authority must be recognized even though the governmental official may have been unaware of such constraints. *See Federal Crop Ins. Corp.*, 332 U.S. at 384, 68 S.Ct. 1 (citing *United States v. Stewart,* 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40 (1940); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917)). Accordingly, if Northern Colorado is unable to establish that Article 22 of the Implementing Contract was legally authorized, then Assistant Secretary Chapman of the Department of the Interior will be held to have exceeded his authority, and the relevant provisions in Article 22 could be rendered void. *See American Airlines, Inc. v. Austin,* 75 F.3d 1535, 1538 (Fed.Cir.1996) ("Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void."); *CACI, Inc. v. Stone,* 990 F.2d 1233, 1236 (Fed.Cir.1993) (" 'If, by ignoring statutory and regulatory requirements, [a governmental official] exceeds his actual authority, the [g]overnment is not estopped to deny the limitations on his authority, ... for the contractor is charged with notice of all statutory and regulatory limitations.' " (quoting *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 371 (1963))).

■ However, the government can be bound by contract even if Assistant Secretary Chapman lacked the necessary authority in July 1938, if the contract or its pertinent terms were later ratified or validated either by statute or by an official with the necessary authority. *See Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1433 (Fed.Cir.1998) (citing *United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901)). Accordingly, the court must examine not only the original authorizing legislation but also the subsequent statutory enactments that have a bearing on the responsibilities of the parties to the Implementing Contract and the allocation of revenues derived from the Project.

## III. THE AUTHORIZING LEGISLATION FOR THE PROJECT

■ Northern Colorado first contends that the authorizing legislation for the Project, the Interior Department Appropriation Act of 1938, enabled the revenue-crediting scheme put into place by Article 22 of the Implementing Contract. Northern Colorado argues that the Secretary of the Interior "as a result of the 1937 authorizing statute, had the implied authority to do exactly what was done in Article 22." Hr'g Tr. 16:2–4. Specifically, Northern Colorado contends that "in fulfilling the congressional direction to enter into a repayment contract, the [S]ecretary [of the Interior] had to define what the rights [of the] respective parties were." Hr'g Tr. 15:23 to 16:1. Through the Secretary of the Interior's fulfillment of the Appropriation Act, argues Northern Colorado, the Colorado–Big Thompson Project and the property rights in its revenues "were defined, created, and exist.... [T]he ... Project could not, and did not, exist without the [Implementing Contract], and the property interest created by that contract did not, and could not, exist prior to the execution of the [C]ontract." Hr'g Tr. 20:3–5, 20–24.

The government responds that because the original authorizing legislation "does not, through clear and express terms or otherwise, allow the [g]overnment to dispose of [f]ederal revenues," it does not provide sufficient authorization, expressly or impliedly, for the provision dealing with the sharing of miscellaneous revenues in Article 22. Def.'s Reply at 1–2. The government argues that Northern Colorado cannot "establish that the contractual agreement contained in Article 22 [of the Implementing Contract] was within the authority of the Department of the Interior to make and is in accordance with law." *Id.* at 1.

### A. Statutory Text

Northern Colorado claims that the authorization for the Project in the Interior Department Appropriation Act of 1938 must be construed in light of the Bureau of Reclamation's "broad contracting authority" pursuant to the reclamation laws. Pl.'s Mot. at 12. As Northern Colorado notes, the Bureau has

been given authority to enter into contracts with irrigation districts, *see* 43 U.S.C. § 511, including contracts specifically for the repayment of construction costs. *See* Pl.'s Mot. at 12 (citing 43 U.S.C. § 423e). The first of these statutes states that

[i]n carrying out the purposes of the Act of June 17, 1902 (32 Stat. 388), and Acts amendatory thereof and supplementary thereto, and known as and called the reclamation law, the Secretary of the Interior may enter into contract[s] with any legally organized irrigation district whereby such irrigation district shall agree to pay the moneys required to be paid to the United States.

Act of May 15, 1922, Pub.L. No. 67–219, § 1, 42 Stat. 541 (codified at 43 U.S.C. § 511). In addition, besides authorizing contracts for the repayment of construction costs, the latter statute cited by Northern Colorado also authorizes the Bureau of Reclamation to enter into contracts for the operation and maintenance of water-project facilities:

No water shall be delivered upon the completion of any new project ... until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district ... providing for payment by the district ... of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States.

Act of May 25, 1926, Pub.L. No. 69–284, § 46, 44 Stat. 636, 649 (codified, as amended, at 43 U.S.C. § 423e).

With the framework and context established by these general laws, Northern Colorado cites to the provision in the Interior Department Appropriation Act of 1938 authorizing the Bureau of Reclamation to enter into "'appropriate[ ] [repayment] contracts with water conservancy districts'" for the Colorado–Big Thompson Project. Pl.'s Mot. at 13 (quoting Interior Department Appropriation Act of 1938, 50 Stat. 595). Northern Colorado argues that the direction from Congress to enter into "appropriate[ ] contracts" indicates that the Bureau is required to determine whether a contract it wishes to enter "is within the authority of the Secretary [of the Interior]." Pl.'s Mot. at 13. Northern

Colorado suggests that in granting the Secretary of the Interior the authority to determine the terms of a repayment contract, Congress empowered the Secretary "to define the respective rights and obligations of the parties" regarding repayment and other associated matters. Pl.'s Reply at 8–10. Northern Colorado contends that this broad authority would be undermined if the government were to succeed in its effort to render void the provisions in Article 22. *Id.* at 10.

Neither the Interior Department Appropriation Act of 1938 nor Senate Document No. 80, incorporated into law by that Act, address in any way the revenue-crediting scheme described in the Implementing Contract. Nor do the Appropriation Act and Senate Document No. 80 contain any authorization for the provision in Article 22 of the Implementing Contract that carriage fees for non-project water "shall be the sole property of [Northern Colorado]." Pl.'s Ex. A at 28–29 (Implementing Contract Article 22). The full text of the provision in the Appropriation Act pertinent to the Project is as follows:

Colorado–Big Thompson project, Colorado: For the construction in accordance with the plan described in Senate Document Number[ ] 80, Seventy-fifth Congress, $900,000: *Provided,* That no construction thereof shall be commenced until the repayment of all costs of the project shall, in the opinion of the Secretary of the Interior, be assured by appropriated [*sic* ] contracts with water conservancy districts, or irrigation districts, or water users associations organized under the laws of Colorado, or other form of organization satisfactory to the Secretary of the Interior.

Interior Department Appropriation Act of 1938, 50 Stat. at 595. And, Senate Document No. 80, as Northern Colorado points out, simply "describes the [Colorado–Big Thompson] [P]roject features, the manner of operation of the [P]roject, the purpose of the [P]roject, an estimate of the amount of water available for diversion, the effect on the west slope, and an estimate of cost." Pl.'s Reply at 11. It "creates no rights or obligations between Northern [Colorado] and the United States." *Id.* Although the report addresses how the Colorado–Big Thompson Project

would be financed, see Def.'s App. at 5 (S.Doc. No. 75–80), and refers to expected costs and repayment plans for water projects, see Def.'s App. at 27–37 (S.Doc. No. 75–80), it does not mention the incidental revenues that are at the heart of Article 22. See id. This omission may be material to the dispute over authority to contract,[9] depending upon what the legislative history indicates Congress contemplated as being an "appropriate[ ] contract" with a water conservancy district.

## B. Legislative History

Congress first attempted to appropriate money for the construction of Colorado–Big Thompson in 1936, when the Senate, by way of an amendment to the 1937 Interior Appropriations bill, passed an authorization for the construction of seven reclamation projects, one of which was the Colorado–Big Thompson Project, then referred to as the Grand Lake–Big Thompson Transmountain Diversion Project. See 80 Cong. Rec. 2900–01 (1936) (statement of Sen. Hayden). However, the Senate amendment proposing the authorization of these seven projects faced staunch opposition in the House of Representatives. See 80 Cong. Rec. 7611–57 (1936). Opponents of the Senate amendment were concerned by the lack of detail provided regarding the projects, the inappropriateness of the Senate's use of an appropriations bill to "authorize" projects, and the large sum of money spent to expand agriculture in the western United States given that the nation's supply of certain crops already outweighed demand. See 80 Cong. Rec. 7624, 7627, 7640, 7645 (1936). Following extensive debate, the House refused to concur with the Senate amendment authorizing the Colorado–Big Thompson Project. See 80 Cong. Rec. 9878 (1936). The proposed authorization thus failed in that Congress.

In the next legislative session, the Senate's first action regarding the Colorado–Big Thompson Project took place on June 15, 1937, when Senator Adams from Colorado requested the printing of Senate Document 80, which provided a detailed proposed construction schedule for the Project, complete with estimated costs for different phases of the proposed Project. 81 Cong. Rec. 5700 (1937) (statement of Sen. Adams); see S. Doc. No. 75–80 (1937). Senate members referred to this document as a detailed model for the proposed Project, see, e.g., S.Rep. No. 75–775, at 1 (1937) ("A summary of the nature and character of the project is set forth in Senate Document No. 80 . . ., which document is referred to [in] the bill for the purpose of describing the project."), and the document was ultimately incorporated in the authorization of funding for the Project. Interior Department Appropriation Act of 1938, 50 Stat. at 595.

Ten days after the printing of Senate Document 80, Senator Adams introduced S. 2681, which authorized "the Secretary of the Interior . . . to construct the Colorado–Big Thompson . . . Project" but did not provide specific funding for the project. 81 Cong. Rec. 6293–94 (1937). On the Senate floor, after a few brief exchanges and the inclusion of several amendments, including a name change and insertion of a provision ensuring that construction would not be commenced until the Secretary of the Interior had entered into "appropriate contracts," the bill was passed by the Senate. See 81 Cong. Rec. 6294 (1937). Senator Adams did not specify the reasoning behind the inclusion of the amendments, and no discussion about the amendments took place prior to the Senate's approval of them. See 81 Cong. Rec. 6293–95 (1937). The amended version of S. 2681 was then inserted into the Interior Department Appropriation bill. See 81 Cong. Rec. 6393 (1937).

Some members of the House, after receiving the Senate's version of the 1938 appropriations bill, expressed displeasure with the provisions regarding the Colorado–Big Thompson Project and with other Senate provisions authorizing and funding new public-works projects that had yet to be considered by a legislative committee. See Cong.

9. See 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made.").

Rec. 6520–21 (1937). Consequently, the House disagreed with the Senate amendments and requested a conference. *Id.* Then, on July 6, 1937, the House Committee on Irrigation and Reclamation issued House Report 1180, which addressed the various studies that had been performed in anticipation of the Colorado–Big Thompson Project and recommended that S. 2681 be passed. H.R.Rep. No. 75–1180, at 4 (1937). Separately, several representatives from Colorado endorsed the Project by way of extended remarks which were printed in the Appendix to the Congressional Record, including a summary by Representative Lewis of Colorado that the Project would "supplement the existing ... water supply [to] 615,000 acres of highly developed and long-settled land in northeastern Colorado" and would "constitute a permanent addition to the capital account not only of Colorado but of the United States." 81 Cong. Rec.App. 1722, 1723 (1937) (statement of Rep. Lewis). Then, in response to what he described as "misleading propaganda [that had] been sent to [c]ongressmen by various organizations opposing the Colorado–Big Thompson reclamation project," such as suggestions that many of the reclamation projects receiving funding would be unable to repay their construction costs to the reclamation fund and that eventually the general treasury would be called upon to provide such funding, Representative Lewis inserted a letter into the record written by Senator Adams from Colorado. 81 Cong. Rec.App. 1777 (1937). In this letter, Senator Adams listed five points supporting the Project, including the argument that the Project "[would] not cost the United States Treasury a single cent [because] [i]ts costs [would] be paid exclusively from the reclamation fund, which [would] be reimbursed by the water users." *Id.*

Following these remarks, House members engaged in discussion and debate regarding the Senate amendments. *See generally* 81 Cong. Rec. 7176–80 (1937). Representative Rich from Pennsylvania expressed concern that while the House was only being asked to appropriate $900,000 for the Colorado–Big Thompson Project, the project would cost $44 million to complete. 81 Cong. Rec. 7180 (1937) (statement of Rep. Rich); *see also id.*

at 7413 (statement of Rep. Rich) ("We are asked to appropriate $900,000 and eventually we must spend $44,000,000 to complete this project. Remember, it will cost $900,000 to get your nose under the tent, then $44,000,000 to complete the project."). Representative Lewis addressed this concern by pointing to language in the appropriations bill that would guarantee that money for the reclamation projects would come from the reclamation fund; Representative Lewis also noted that the projects would be required to reimburse this fund in accordance with "reclamation law." 81 Cong. Rec. 7180 (1937) (statement of Rep. Lewis). Other supporters of the appropriation argued that project funding would come from the reclamation fund due to the fact that it was a revolving fund. *See, e.g.,* 81 Cong. Rec. 7414–15 (1937) (statement of Rep. Robinson of Utah) ("Not one dollar of ... money [for the construction of the Colorado–Big Thompson Project] comes from the Federal Treasury[;] [rather,] [t]he money comes from the Reclamation Fund."). Representative Fitzpatrick from New York specifically pointed to the provision requiring the Secretary of the Interior to enter into construction-repayment contracts as "pro[of] ... that there will be no cost to the [g]overnment" as a result of the Colorado–Big Thompson Project. 81 Cong. Rec. 7417 (1937) (characterizing the project as "self-liquidating" based on the requirement that the Secretary of the Interior enter into "appropriate contracts" addressing the repayment of costs prior to the start of construction). Following Representative Fitzpatrick's statements, the House voted to concur in the amendment authorizing and funding the Colorado–Big Thompson Project. 81 Cong. Rec. 7418 (1937).

In short, an examination of the legislative history indicates that in passing the pertinent provisions of the Interior Department Appropriation Act of 1938, Congress sought to protect the reclamation fund by ensuring that water users would reimburse the fund for construction costs paid out of the fund. It was for this reason that the Secretary of the Interior was required to enter into repayment contracts with water users prior to the initiation of construction on the Colora-

do–Big Thompson Project. This focus on the sustainability of the fund tracks the government's broader argument that "the history of ... reclamation law, from 1902 ... through 1938, demonstrates a considerable struggle on the part of Congress to find ways to make the projects self-sustaining." Hr'g Tr. 45:22 to 46:1.

There is no discussion in the legislative history of the 1938 Appropriation Act regarding miscellaneous revenues and no discussion whether the Secretary of the Interior had any special authority to allocate such revenues. Although the Appropriation Act combines an authorization with an appropriation and conditions the distribution of the appropriation on the Secretary of the Interior's entry into a contract with a water district to repay construction costs, neither the Act itself nor the incorporated Senate report specify any special contractual authority that the Secretary of the Interior was to assume beyond the general authority provided by the reclamation laws.

### C. Summary

Besides the specific direction to the Secretary of the Interior to enter into a contract that provided for repayment before construction could commence on the Project, no special authority to contract was either expressly or impliedly granted by Congress to the Secretary in the Interior Department Appropriation Act of 1938. By contrast, when Congress has in the past sought to grant an agency or other party the authority to dispose of property or revenues in novel ways, it has done so with an explicit set of directions. For instance, in the Fact Finders' Act of 1924, Congress stated that

> whenever the water users take over the care, operation, and maintenance of a project, ... the total accumulated net profits, as determined by the Secretary, ... shall be credited to the construction charge of the project, ... and thereafter the net profits from such sources may be used by the water users to be credited annually, first, on account of project construction charge, second, on account of project operation and maintenance charge, and third, as the water users may direct. No distribution to individual water users shall be

> made out of any such profits before all obligations to the [g]overnment shall have been fully paid.

Pub.L. No. 68–292, § 4, 43 Stat. 703 (1924) (codified at 43 U.S.C. § 501). Congress has also authorized the allocation of revenues in legislation relating to the Upper Colorado River Basin Fund and the Lower Colorado Basin Development Fund. *See* 43 U.S.C. § 620d(e) (addressing apportionment of excess revenues from the Upper Colorado River Basin Fund among four states); 43 U.S.C. § 1543(f) (setting forth in detail "[a]dditional uses of revenue funds" from the Lower Colorado River Basin Development Fund). However, in the 1938 Appropriation Act, the Secretary of the Interior was merely directed to enter into an "appropriate[ ] contract," and was not given the kind of fine-grained directions present in the Fact Finders' Act's instructions concerning the disposal of these revenues. The provisions related to the Colorado–Big Thompson Project in the Interior Department Appropriation Act of 1938 thus do not constitute a particular grant of authority to deal with miscellaneous revenues.

Accordingly, because only Congress may authorize the allocation of miscellaneous revenues at issue in this case, and because Congress did not speak to the question of the sharing of miscellaneous revenues directly in the Interior Department Appropriation Act of 1938, an allocation of such revenues in Article 22 of the Implementing Contract cannot be said to have been authorized by this Act.

## IV. THE HAYDEN–O'MAHONEY AMENDMENT

The government contends that, in any event, the revenue-allocation scheme established by Article 22 of the Implementing Contract is overridden by the Hayden–O'Mahoney Amendment to the Interior Department Appropriation Act of 1939, Pub.L. No. 75–497, 52 Stat. 291, 322, (1938) (codified at 43 U.S.C. § 392a). Def.'s Reply at 16. This amendment, enacted fifty-seven days before the parties entered into the Implementing Contract, established a rule that moneys received in connection with certain irrigation

projects involving the Bureau of Reclamation be credited to the reclamation fund:

> All moneys received by the United States in connection with any irrigation projects, including the incidental power features thereof, constructed by the Secretary of the Interior through the Bureau of Reclamation, and financed in whole or in part with moneys heretofore or hereafter appropriated or allocated therefor by the [f]ederal [g]overnment, shall be covered into the reclamation fund, except in cases where provision has been made by law or contract for the use of such revenues for the benefit of users of water from such project.

52 Stat. 291, 322–23. The government suggests that the Hayden–O'Mahoney Amendment, by its plain language, "limits the authority of [the Department of the] Interior to agree to any different disposition of incidental revenues from the [Colorado–Big Thompson] Project." Def.'s Reply at 16. In the face of this amendment, argues the government, all parties contracting with the Secretary of the Interior on irrigation projects must abide by the default rule "that, unless Congress said otherwise, all revenues generated from ... federally owned lands would go back into the [r]eclamation [f]und." Hr'g Tr. 54:11–14. The government concludes that as a result of this circumscription of the Secretary's authority, the sharing of non-project revenues with Northern Colorado was invalid. Def.'s Reply at 17–18.

In response, Northern Colorado posits several reasons why the Hayden–O'Mahoney Amendment did not prevent the Secretary of the Interior from entering into Article 22 of the Implementing Contract. Northern Colorado argues that the relevant excess-capacity revenues paid or credited to Northern Colorado under Article 22 were not among those moneys "received" by the United States within the meaning of the amendment, Pl.'s Reply at 14, that the amendment targeted revenues directed to repayment rather than the miscellaneous revenues described by Article 22, Hr'g Tr. 23:22–25, and that Article 22 "allocate[d] revenues specifically for the benefit of users from the [P]roject," thus

bringing it within the terms of the amendment's savings clause. Pl.'s Mot. at 15.

Because the Interior Department Appropriation Act of 1938 and other then-existing provisions of reclamation law were insufficient to authorize the revenue-allocation provisions set out in Article 22 of the Implementing Contract, see supra, at 652, the question of whether the Hayden–O'Mahoney Amendment precludes such an allocation of revenues is largely moot. The Hayden–O'Mahoney Amendment could have had a bearing on the provisions of Article 22 only if the Secretary of the Interior or his designee otherwise had authority to enter into those revenue-allocation provisions. And, as the following analysis shows, the Hayden–O'Mahoney Amendment does nothing to provide authority to contract but rather limits authority that might already have existed.

### A. Statutory Text

In addressing the plain meaning of the Hayden–O'Mahoney Amendment, neither party contests that "revenues actually received by the United States are federal moneys." Pl.'s Mot. at 23. It is equally apparent from the plain meaning of the opening clause of the amendment—"[a]ll moneys received by the United States"—that if revenues generated from irrigation projects are never "received" by the United States, then these revenues do not fall within the scope of the Hayden–O'Mahoney Amendment. The question, then, is what constitutes receipt of revenues by the United States.

The government argues that "[a]ll moneys received" means all moneys, including incidental non-project revenues, generated in connection with Colorado–Big Thompson. See Hr'g Tr. 56:8–12; Def.'s Reply at 17. This argument comports with the plain language of the amendment to some degree, but also conflates the "[a]ll moneys received" language of the amendment with a broader category of all moneys *generated* or *derived* from irrigation projects. The government tries to overcome this deficiency in several ways. First, the government argues that "miscellaneous revenues generated by [r]eclamation [p]rojects are [f]ederally owned, regardless of what entity initially receives the revenues." Def.'s Cross–Mot. at 20. However,

this contention ignores the shared responsibilities and obligations established under the arrangements for the Colorado–Big Thompson Project, rendering the ownership status of revenues generated from these facilities dependent upon how Congress has allocated the revenues. *See supra*, at 647–48 & n. 8. Accordingly, it cannot be said that the moneys addressed by Article 22 of the Implementing Contract are inherently "received by the United States" merely by virtue of federal title to the facilities of the Colorado–Big Thompson Project. Second, the government argues that the reference in the Hayden–O'Mahoney Amendment to irrigation projects that are "financed in whole or in part" by a governmental appropriation indicates that the amendment creates a scheme whereby any government financing of an irrigation project results in the government "taking control of the [resulting] revenues" from the project, given that the government would "not otherwise be[ ] compensated for those appropriated amounts." Hr'g Tr. 57:1–7. Yet this argument contains a logical inference—regarding Congress's rationale for asserting control over all revenues derived from an irrigation project financed in part by the government—that is neither stated nor implied within the text of the amendment or its legislative history.

Notably, Congress has on occasion used the phrase "all moneys or revenues derived from" to indicate the scope of revenues it wishes to address. *See, e.g.*, 43 U.S.C. § 521 ("[T]he moneys derived from such contracts [concerning sale of surplus waters] shall be covered into the reclamation fund."); 48 U.S.C. § 50f ("[M]iscellaneous revenues derived from schools, hospitals, and other facilities . . . shall be covered into the Treasury."); 7 U.S.C. § 304 ("All moneys derived from the sale of lands . . . shall be invested in bonds of the United States or of the [s]tates or some other safe bond."). Northern Colorado contends that if Congress had wanted to cover a similarly broad range of revenues with the Hayden–O'Mahoney Act, it would have employed analogous statutory language. Pl.'s Reply at 15. Certainly, the fact that Con-

gress has occasionally used the phrase "all moneys *derived from*" to refer to a wide range of revenues does not mean that Congress is condemned to repeat that exact same turn of phrase when it wants to encompass a similarly wide range of revenues in a statute. However, such linguistic comparisons, analyzed in concert with the legislative history of the amendment, do help to shed light on Congress's intent in enacting the Hayden–O'Mahoney Amendment and on the meaning of "[a]ll moneys received by the government."

### B. Legislative History

The Hayden–O'Mahoney Amendment originated in identical bills brought before the Senate Committee on Public Lands and Surveys, S. 3681, 75th Cong. (1938), and the House Committee on Public Lands, H.R. 10120, 75th Cong. (1938). *See* 83 Cong. Rec. 4728 (1938) (statement of Sen. Hayden); 83 Cong. Rec. 5814–15 (1938) (statement of Rep. Englebright). Both the Senate and House committees completed reports on the respective bills, and both reports contained a letter from the Secretary of the Interior explaining the need for the proposed legislation, the meaning of specific provisions within that legislation, and recommendations regarding amendments to the bills. *See* S.Rep. No. 75–1544 (1938); H.R.Rep. No. 75–2178 (1938).[10] The primary purpose of the proposed legislation, as memorialized in these reports, was to infuse the reclamation fund with immediate capital and to provide avenues by which future revenue would flow into the fund. *See id.* at 1. Furthermore, a letter from the Secretary of the Interior attached to both reports specified that the Hayden–O'Mahoney Amendment

would accomplish two purposes: It would transfer a portion of the receipts from royalties on oil from naval petroleum reserves to the reclamation fund, and it would cover into the reclamation fund *repayments of project costs* made by water and power users, with certain exceptions to avoid conflict with existing contracts and special legislation, on all [f]ederal [r]ecla-

---

**10.** Following the Senate report on S. 3681, Senator Hayden proposed that the bill be included as an amendment in the 1939 Interior Appropria-

tion bill. *See* 83 Cong. Rec. 4709, 4727 (1938) (statement of Sen. Hayden).

mation projects, regardless of the original source of funds expended in the construction.

S.Rep. No. 73–1544, at 2 (Letter from Harold L. Ickes, Secretary of the Interior (Mar. 23, 1938)) (emphasis added); H.R.Rep. No. 75–2178, at 2 (Letter from Harold L. Ickes, Secretary of the Interior (Apr. 19, 1938)). Secretary Ickes noted that

> Section 3 of the bill provides that all moneys received by the United States in *repayment of construction costs* in connection with any irrigation project of the Bureau of Reclamation, with the exceptions noted above, shall be covered into the reclamation fund. Involved here are collections to be made in connection with the [f]ederal irrigation projects begun or continued with allotments by the Public Works Administration; with allotments from the Emergency Relief Acts of 1935 and 1937[;] and with appropriations direct from the General Treasury.

*Id.* (emphasis added).

The themes of Secretary Ickes' letters are reflected in individual legislators' statements made on the Senate and House floors addressing the amendment. The majority of the Senate debate concerning this bill took place on April 5, 1938. *See* 83 Cong. Rec. 4709 (1938). Although much of the debate was occupied with a discussion regarding the section of the amendment dealing with the distribution of naval oil reserve revenues, *see* 83 Cong. Rec. 4727–35 (1938), Senator Hayden also explained that the amendment was necessary given the depleted condition of the reclamation fund, *see* 83 Cong. Rec. 4728 (1938) (statements of Sen. Hayden), and other senators noted that the reclamation fund was not only in need of an immediate infusion of money, but also required new avenues for future funding due to changes to homestead law and the expansion of naval oil reserves. *See* 83 Cong. Rec. 4732–33 (1938) (statements by Sens. Hale, O'Mahoney, and others). These statements reflect the history of the reclamation fund, which by the 1920s "was becoming insolvent because the water districts were not repaying their obligations to the federal government," *Elephant Butte Irrigation Dist. of N.M. v. United*

*States Dep't of Interior,* 269 F.3d 1158, 1166–67 (10th Cir.2001) (citing S. Doc. No. 68–92, at 106–07 (1924)), and which by the 1930s had become so severely depleted that funding for various reclamation projects was being taken directly out of the general Treasury. *See* 83 Cong. Rec. 5811 (statement of Rep. Taber of New York); 83 Cong. Rec. 4733–34 (statement of Sen. Hayden). Because some reclamation project financing was being provided directly from the general Treasury and not from the reclamation fund, any money paid back by water users under those repayment contracts was being deposited directly into the Treasury. The Hayden–O'Mahoney Amendment sought to alter this situation by "provid[ing] that all moneys collected as repayments on projects for which the [g]overnment has put up ... cash and which the law now provides shall go directly into the Treasury of the United States shall be turned into the reclamation fund until the entire cost has been paid into that fund." 83 Cong. Rec. 5811 (1938) (statement of Rep. Taber). Members of Congress who supported and opposed the amendment both repeatedly referred to its specific effect on repayments from reclamation projects, which would, under the amendment, be diverted into the reclamation fund. *See, e.g.,* 83 Cong. Rec. 5811 (1938) (statement of Rep. Leavy) (stating that the Hayden–O'Mahoney Amendment "will ... cover into the reclamation fund all repayments"); 83 Cong. Rec. 5812 (1938) (statement of Rep. Taber) ("You are not taking revenues from public lands, you are not taking receipts from public resources, you are taking repayments that are made to the [g]overnment on reclamation projects."). Senator Hayden predicted that "$1,000,000 or $1,100,000" would be added to the reclamation fund annually with the passage of the Hayden–O'Mahoney Amendment. 83 Cong. Rec. 4734 (1938).

Accordingly, Northern Colorado is correct in its argument that the primary purpose of the Hayden–O'Mahoney Amendment was to bolster the reclamation fund by capturing repayment moneys already owed to the general Treasury and diverting these repayments to the reclamation fund. This same conclusion was reached by the district court and the Tenth Circuit in the *Elephant Butte*

litigation, albeit with respect to a different set of contracts: those made under Section 4–I of the Fact Finders' Act. *See Elephant Butte Irrigation Dist.*, 269 F.3d at 1164. As a general matter of legislative history, the Tenth Circuit in that litigation noted its agreement with the district court's analysis:

> After analyzing the plain language of the statute, the district court extensively assessed the legislative history behind Hayden–O'Mahoney. The court cited several letters from the Secretary of the Interior explaining the proposed legislation, which were published in the Congressional Record. These letters demonstrate that the purpose behind Hayden O'Mahoney was the bolstering of the reclamation fund, "perhaps at the expense of the General Treasury, but not at the expense of the water users, except with regard to power revenues."

*Id.* (citations to the opinion of the district court omitted). The district court in the *Elephant Butte* litigation had made frequent references to the letters from the Secretary of the Interior, in which it was made evident that the amendment's two purposes were to transfer receipts from royalties on oil reserves to the reclamation fund and to " 'cover into the reclamation fund repayments of project costs made by water and power users.' " *Elephant Butte Irrigation Dist. v. United States Dep't of Interior*, 1992 WL 814077, at *3 (D.Utah Sept.3, 1992) (quoting 83 Cong. Rec. 5815 (1938)). It is apparent, then, that the Hayden–O'Mahoney Amendment was intended to function as a measure that redirected repayment revenues from the general Treasury into the reclamation fund, and not as a substantive assertion of federal governmental control over all revenues generated from reclamation projects.

### C. Summary

The text of the Hayden–O'Mahoney Amendment would not on its face apply to revenues paid to Northern Colorado under Article 22. In addition, an examination of the legislative history suggests that Congress intended to apply the amendment to redirect revenues due the United States in repayment of project costs from the general Treasury into the reclamation fund. However, the court need not decide whether the Hayden–O'Mahoney Amendment would have had a broader effect by reaching other revenues, such as those "derived from the carriage of other than project water" at the Colorado Big–Thompson Project. Pl.'s Ex. A at 28 (Implementing Contract Article 22). On its face, the Hayden–O'Mahoney Amendment provides no authority for the Department of the Interior to enter into miscellaneous-revenue provisions in contracts between the Department and water districts, and thus where such authority otherwise was lacking, the Hayden–O'Mahoney Amendment would have no application. Correlatively, the court need not reach the parties' various arguments regarding the savings clause in the Hayden–O'Mahoney Amendment.

## V. SECTION 225 OF THE RECLAMATION REFORM ACT OF 1982

■ Lastly, Northern Colorado contends that Section 225 of the Reclamation Reform Act of 1982, Pub.L. No. 97–293, Title II, § 225, 96 Stat. 1261, 1273 (codified at 43 U.S.C. § 390xx), validated Article 22 of the Implementing Contract. Pl.'s Reply at 17–18. The Section is captioned "Validation of contracts entered into prior to October 1, 1981," and provides that

> [t]he provisions of any contract entered into prior to October 1, 1981, by the Secretary with a district, which define project or nonproject water, or describe the delivery of project water through nonproject facilities or nonproject water through project facilities to lands within the district, are hereby authorized and validated on the part of the United States.

43 U.S.C. § 390xx. Northern Colorado claims that its Implementing Contract with the Department of the Interior satisfies the requirements of 43 U.S.C. § 390xx because "the [Implementing] Contract was entered into prior to October [ ] 1, 1981; the contract is between the Secretary of [the] Interior and Northern [Colorado]; and Article 22 is specifically about the delivery of nonproject water through the [Colorado–Big Thompson]

Project facilities to lands within [the] Northern [Colorado District]." Pl.'s Surreply at 9.

The government argues that Northern Colorado is unable to invoke 43 U.S.C. § 390xx to validate its Implementing Contract with the Department of the Interior because "Section 225 ... addressed the specific issue of acreage limitations and commingling for existing contracts." Def.'s Reply at 13.[11] In support, the government relies on the fact that the Reclamation Reform Act of 1982 was "principally aimed at addressing the problems of excess-land limitations." Hr'g Tr. 81:14–17.[12] As additional support for its interpretation that 43 U.S.C. § 390xx validates only contractual provisions that address commingling and acreage limitations, the government cites a regulation issued by the Bureau of Reclamation, 43 C.F.R. § 426.15, and a section of the Department of the Interior's Reclamation Manual addressing directives and standards on the "Use of Excess Capacity in Reclamation Projects for the Impoundment, Storage, and Carriage of Non–Project Water." Def.'s Reply at 14. The government asserts that those authorities are entitled to deference under either *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), supporting its interpretation that 43 U.S.C. § 390xx validates only contractual provisions that address commingling and acreage limitations. Def.'s Reply at 14–15. Under the government's reading of 43 U.S.C. § 390xx, the statute would not be applicable to the Implementing Contract because the Colorado–Big Thompson Project was exempted from acreage limitations in 1938. *Id.* at 15.

In response, Northern Colorado emphasizes that the plain language of the provision contravenes the government's interpretation. Pl.'s Surreply at 9–10. Northern Colorado argues that 43 U.S.C. § 390xx would have the meaning the government ascribes to the provision only if a phrase were added that limited the application of the statute to the " 'provisions of any contract ... which' addresses the specific issue of acreage limitations and commingling." *Id.* at 9. Additionally, Northern Colorado supports its argument that 43 U.S.C. § 390xx is not limited to validating only provisions that address acreage limitations by noting that any reference to acreage limitations was deleted in the conference committee. *Id.* at 10.

### A. The Historical Development of the Reclamation Reform Act of 1982

The Reclamation Reform Act of 1982 was developed in response to the decision of the United States District Court for the District of Columbia in *National Land for People, Inc. v. Bureau of Reclamation of the Dep't of the Interior*, 417 F.Supp. 449, 452 (D.D.C. 1976), *aff'd*, No. 76–2027, 1980 WL 6208 (D.C.Cir.Nov. 20, 1980); *see Westlands Water Dist.*, 134 F.Supp.2d at 1119 (recounting the progression of events). In *National Land for People*, the district court enjoined the Bureau of Reclamation from approving new contracts for excess land sales until the Bureau had initiated public rule-making proceedings regarding the "criteria and procedures for approval of excess land sales." 417 F.Supp. at 453. As a result of the decision in *National Land for People*, the Bureau of

---

**11.** The Code of Federal Regulations states that "[c]ommingled water means irrigation water and nonproject water that use the same facilities." 43 C.F.R. § 426.15(a). At times, the government equates commingling to the acreage limitation. *See, e.g.,* Hr'g Tr. 79:13–16.

**12.** "Excess lands" is a term of art in federal reclamation law, referring to lands in excess of 160 acres. *See Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 279, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); *United States v. Tulare Lake Canal Co.*, 535 F.2d 1093, 1094 (9th Cir. 1976). The Reclamation Act of 1902 had two purposes: to "encourage family farming on modest-sized parcels [160 acres];" and "to increase agricultural output by subsidizing the irrigation of formerly arid and unproductive lands." *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 899 F.2d 814, 824 (9th Cir.1990). The 1902 Act was amended by the Omnibus Adjustment Act of 1926, Pub.L. No. 69–206, 44 Stat. 478 (codified at 43 U.S.C. § 423e), to "require[ ] water recipients who owned lands in excess of 160 acres to enter into a contract with [the Department of the] Interior in which they agreed to sell their excess lands within ten years at a price not reflecting the availability of project water." *United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1118 (E.D.Cal.2001) (referring generally to the effect of 43 U.S.C. § 423e).

Reclamation "did not approve land sales from 1976 through 1984." *Westlands Water Dist.*, 134 F.Supp.2d at 1118 (noting that the district court's injunction produced the result that landowners were unable to sell their excess lands but continued to receive subsidized water); *see* S.Rep. No. 96–235, at 8 (1979) (explaining that the regulations the Bureau of Reclamation promulgated in response to the decision in *National Land for People* were enjoined due to a failure to properly comply with the National Environmental Policy Act).

In response to these developments, Congress sought to enact new reclamation legislation. *See* S.Rep. No. 96–235, at 8 (1979) (addressing Senator Church's proposed Reclamation Reform Act of 1979 and stating that its "purpose [ ] is to provide a modern expression of congressional policy regarding Reclamation Law to resolve the many [outstanding] controversies"). The efforts of Congress to modify reclamation law culminated with the passage of the Reclamation Reform Act of 1982.

A precursor to 43 U.S.C. § 390xx was introduced in the Senate as part of Section 108 of the proposed Reclamation Reform Act of 1981. S. 1867, 97th Cong. § 108 (1981); *see* 127 Cong. Rec. 27958 (1981). This initial version provided that "[a]ny provision of any contract between the Secretary and any party to a contract dealing with matters arising under the [f]ederal reclamation laws generally may be validated at the request of any non-[f]ederal party to such contract made to the Secretary within three years after the enactment of this Act." S. 1867, 97th Cong. § 108(a) (1981). The Secretary of the Interior sought to have this "validation provision [ ] deleted from the bill," stating his belief that "[t]he effect of [S]ection 108 could be to validate various provisions that may be in conflict with the acreage limitations and other provisions established by the Act as well as other [f]ederal reclamation laws." S.Rep. No. 97–373, at 28 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2570, 2590–91. The

Secretary explained that the provision would complicate reclamation law because "virtually all questions which this section has been designed to cover relate to payout, and since payout is already covered under [S]ection 106(a), [there is] no necessity for the inclusion of this provision." *Id.*[13]

The Senate then substantively altered the provision, to provide that "[a]ny non-[f]ederal party to a repayment contract with the Secretary relating to a reclamation project may obtain validation of any *provisions of such contract relating to the acreage limitation* available to such party." S.Rep. No. 97–373, at 5 (1982) (emphasis added). The accompanying Senate report explained that the modified validation provision "addresses contracts entered into between non[f]ederal entities and the Secretary, containing provisions which provide for 'relief' from, or are otherwise related to, the acreage limitation of the [f]ederal reclamation law upon repayment of the amount called for in the contract." *Id.* at 18, U.S.Code Cong. & Admin.News 1982, p. 2582. The bill that then passed the Senate contained the amended validation provision. *See* 128 Cong. Rec. 16636 (1982).

Contemporaneously with the Senate's attempts to modify reclamation law, the House of Representatives was preparing its own legislative proposal. *See* H.R. 5539, 97th Cong. (1981). Initially, the House addressed validation in a section of the bill captioned "Administrative Provisions[,]" stating in pertinent part that

> [t]he provisions of any contract entered into prior to October 1, 1981, by the Secretary with a district, which define project or non-project water, or describe the delivery of project water through non-project facilities or non-project water through project facilities to lands within the district, are hereby authorized and validated on the part of the United States.

H.R. 5539, 97th Cong. § 211 (1982); H.R.Rep. No. 97–458, at 1. By including this validation provision in its bill, the House of

---

**13.** Payout provisions allowed a reclamation project to be exempt from the acreage limitations of federal reclamation law once the project had satisfied its repayment obligation. H.R.Rep. No. 97–458, at 11 (1982). However, in 1976, the

United States Court of Appeals for the Ninth Circuit determined that payout provisions were invalid. *See Tulare Lake Canal Co.*, 535 F.2d at 1143.

**659**

Representatives sought to maintain the Bureau of Reclamation's existing practice respecting "exchanged" waters [14] and commingled waters. H.R.Rep. No. 97–458, at 44. Thus, unlike the Senate's provision, the House's validation provision did not focus on acreage limitations. The House bill, as passed, included this validation provision.

A conference committee was convened to reconcile the differing bills, and the committee resolved to adopt the House version of the validation provision. *See* H.R.Rep. No. 97–855, at 14 (1982) (Conf.Rep.). The conference committee explained that "[t]he House amendment provide[d] for validation of contract clauses dealing only with commingled water as described in contracts entered into prior to October 1, 1981," whereas the Senate version "provide[d] for validation of contract provisions related to the acreage limitations." *Id.* at 35. The final version of the Reclamation Reform Act of 1982 thus incorporated the House provision. *Id.*[15]

### B. A Question of Deference Owed

In support of its argument that 43 U.S.C. § 390xx does not apply to Article 22 of Northern Colorado's Contract with the Department of the Interior, the government relies on 43 C.F.R. § 426.15(b) and the Department of the Interior's Reclamation Manual. Def.'s Reply at 14–15; Hr'g Tr. 85:2–23. The government explains that these two sources support its argument because they limit the applicability of 43 U.S.C. § 390xx to only those contractual provisions that address commingling and acreage limitations. Def.'s Reply at 14; *see* Hr'g Tr. 85:24 to 86:1. The regulations adopted by the Department of the Interior to implement the Reclamation Reform Act of 1982 currently provide that "[i]f a district entered into a contract with Reclamation prior to October 1, 1981, and that contract has provisions addressing commingled water situations, those provisions stay in effect for the term of that contract and any renewals of

it." 43 C.F.R. § 426.15(b). Under the regulations, "[c]ommingled water means irrigation water and nonproject water that use the same facilities." 43 C.F.R. § 426.15(a). Similarly, the Department of the Interior's Reclamation Manual explains that "[f]or water service or repayment contracts entered into prior to October 1, 1981, the [Reclamation Reform Act of 1982] validates all provisions addressing the commingling of project and non-project water." Pl.'s Ex. AA at 459 (Reclamation Manual at WTR 04–01 § 2(B)(1), Directives and Standards for the Use of Excess Capacity in Reclamation Projects for the Impoundment, Storage, and Carriage of Non–Project Water (Nov. 22, 2000)). The government claims that these two authorities support its interpretation of 43 U.S.C. § 390xx and are entitled to receive substantial deference. *See* Hr'g Tr. 86:12–24.

■ In determining whether an agency's regulation or other action is valid a court must ask two questions. *See, e.g., Chevron,* 467 U.S. at 842, 104 S.Ct. 2778; *Fathauer v. United States,* 566 F.3d 1352, 1353 (Fed.Cir. 2009). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. "If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Any regulation promulgated by an agency relating to an issue that Congress did not specifically address "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.,* 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

14. The House of Representatives defined exchanged waters as a situation "where[ ] project water is delivered in exchange for non-project water which the contractor would otherwise be entitled to receive, but which instead is provided to third party beneficiaries." H.R.Rep. No. 97–458, at 44.

15. After deciding to adopt the House's version of the validation provision, the conference committee agreed to delete the Senate provision "as unnecessary." H.R.Rep. No. 97–855, at 35 (1982).

■ Before engaging in *Chevron* analysis, a court must first determine whether it is appropriate to utilize the two-step framework to evaluate the relevant provisions. *See, e.g., Mead,* 533 U.S. at 226–27, 121 S.Ct. 2164; *Groff v. United States,* 493 F.3d 1343, 1349–50 (Fed.Cir.2007). In *Mead,* the Supreme Court explained that *Chevron* applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law" and when "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead,* 533 U.S. at 226–27, 121 S.Ct. 2164. By contrast, when no such delegation has been made, an agency's interpretation of statutory language is entitled to no particular weight. *See Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead,* 533 U.S. at 227, 121 S.Ct. 2164. Building upon the Supreme Court's decision in *Mead,* the Federal Circuit has stated that "[t]he core issue in deciding whether *Chevron* deference is warranted is whether 'Congress meant to delegate to the agency the authority to make determinations having the force of law.'" *Groff,* 493 F.3d at 1349–50 (quoting *Cathedral Candle Co. v. International Trade Comm'n,* 400 F.3d 1352, 1361 (Fed.Cir.2005)).

In *Mead,* the Supreme Court explained that "express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed" are a powerful indication that Congress sought to imbue the agency with lawmaking authority. 533 U.S. at 229, 121 S.Ct. 2164. Under the Reclamation Reform Act of 1982, the Secretary of the Interior was authorized to "prescribe regulations" to implement the provisions of that Act and "other provisions of [f]ederal reclamation law." 43 U.S.C. § 390ww(c). This delegation to the Secretary of the Interior to promulgate regulations to implement the Reclamation Reform Act of 1982 satisfies the first prong of the *Mead* inquiry.

To satisfy the second prong of *Mead,* 43 C.F.R. § 426.15 must have been promulgated with a "lawmaking pretense." *Mead,* 533 U.S. at 233, 121 S.Ct. 2164. The current version of 43 C.F.R. § 426.15 was adopted in 1996 after notice-and-comment rulemaking, as part of the Department of the Interior's reexamination of how the Reclamation Reform of Act 1982 was implemented. *See* Acreage Limitation and Water Conservation, 61 Fed.Reg. 66754, 66802 (Dec. 18, 1996). The Supreme Court has stated that "the framework of deference set forth in *Chevron* does apply to an agency interpretation contained in a regulation." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *see Mead,* 533 U.S. at 230, 121 S.Ct. 2164. Thus, the Department of the Interior's interpretation of 43 U.S.C. § 390xx contained in 43 C.F.R. § 426.15 is amenable to evaluation under the *Chevron* framework.

It is axiomatic that in applying the first step of the *Chevron* analysis, the court must identify "the precise question at issue." *GHS Health Maint. Org., Inc. v. United States,* 536 F.3d 1293, 1296–97 (Fed.Cir.2008) ("Identifying 'the precise question at issue' is a necessary prerequisite to determining whether or not Congress has directly spoken on it."). In this instance, the "precise question at issue" is whether 43 U.S.C. § 390xx serves to validate only those provisions of contracts entered into before October 1, 1981 that address commingling and acreage limitations. *See, e.g.,* Def.'s Reply at 13; Pl.'s Surreply at 9. Northern Colorado asserts that Congress has spoken directly to the issue in Section 390xx and that 43 C.F.R. § 426.15(b) contradicts the unambiguously expressed intent of Congress. Pl.'s Surreply at 9–10.

■ In determining whether Congress has spoken directly to the issue, the court "employ[s] the traditional tools of statutory construction; [it] examine[s] the statute's text, structure, and legislative history, and appl[ies] the relevant canons of interpretation." *Delverde, SrL v. United States,* 202 F.3d 1360, 1363 (Fed.Cir.2000); *see also NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413,

98 L.Ed.2d 429 (1987) (stating that the primary task of a court engaging in statutory construction is to "determine congressional intent, using traditional tools of statutory construction") (internal quotation marks omitted). " '[T]he starting point in every case involving construction of a statute is the language itself.' " *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1425 (Fed.Cir.1988) (quoting *United States v. Hohri,* 482 U.S. 64, 69, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987)). In undertaking statutory construction, the court endeavors to give the terms of a statute their "ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (internal quotation marks omitted). The Federal Circuit recently emphasized " 'that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, this first canon is also the last: judicial inquiry is complete.' " *Fathauer,* 566 F.3d at 1356–57 (quoting *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 461–62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002)).

Section 390xx provides that a provision of a contract entered between the Secretary of the Interior and a district prior to October 1, 1981 is validated if it "define[s] project or nonproject water, or describe[s] the delivery of project water through nonproject facilities or nonproject water through project facilities to lands within the district." 43 U.S.C. § 390xx. The plain text sets forth the factors that must appertain before a provision in a contract, implicit or otherwise, entered before October 1, 1981 is validated. This text makes no reference to acreage limitations.

■ The government claims that 43 C.F.R. § 426.15 is consistent with 43 U.S.C. § 390xx because in passing the Reclamation Reform Act of 1982, Congress' main focus was to address the issue of acreage limitations and commingling. Def.'s Reply at 12–13; Hr'g Tr. 79:12–16. Although the plain language of Section 390xx does not limit its application to contractual provisions that address acreage limitations, the government nonetheless contends that such a require-ment is implicit in the Section when it is examined in conjunction with the other provisions of the Reclamation Reform Act of 1982. Def.'s Reply at 12–13. In support of its position, the government relies on the principle that a court should examine statutory language in the "broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). However, "[a]bsent a clearly expressed legislative intention to the contrary, th[e statutory] language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Emphatically, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). Accordingly, the Supreme Court has rejected agency interpretations that relied on claims that " 'a statute must be read with a view to the 'policy of the legislation as a whole' ' " in the face of contradictory statutory texts:

> Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its [m]embers may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Id.* at 373–74, 106 S.Ct. 681. Here, the other provisions of the Reclamation Reform Act of 1982 do not in any way suggest that the unambiguous language in 43 U.S.C. § 390xx does not mean exactly what it says.

Additionally, the government relies on the legislative history surrounding the passage of the Reclamation Reform Act of 1982 to sup-

port its contention that Section 390xx validates only provisions of a contract that address commingling in the context of acreage limitations. Def.'s Reply at 13–14; Hr'g Tr. 83:8 to 85:1. The government seeks to draw support from the fact that the Reclamation Reform Act of 1982 adopted the House of Representatives' version of 43 U.S.C. § 390xx, which "provide[d] for validation of contract clauses dealing only with commingled water as described in contracts entered into prior to October 1, 1981." S.Rep. No. 97–568, at 35 (1982) (Conf.Rep.); H.R.Rep. No. 97–458, at 17 (1982) (stating that when "there have been situations where both project and nonproject water is delivered through [f]ederally financed facilities ... special provisions have been made in the contract with the particular district relating to the application of the acreage limitation provisions of the reclamation laws. The bill would validate any of these particular provisions"). However, these statements from the legislative history do not help the government because the language of the validation provision as adopted does not link commingling to the acreage limitations, but instead the enacted text specifically refers to "the delivery of project water through nonproject facilities" and "nonproject water through project facilities to lands within the district," thus specifying the types of commingling it was addressing. 43 U.S.C. § 390xx. Notably, the conferees adopted the House version of the validation provision rather than the Senate version, which had been revised to tie commingling explicitly to acreage limitations. *See supra,* at 658–59. The Bureau cannot through interpretation essentially recast this decision of a conference committee on legislation. "If the statutory language is clear and unambiguous, the inquiry ends with the plain meaning." *Myore v. Nicholson,* 489 F.3d 1207, 1211 (Fed.Cir.2007); *see Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (stating that "where the statutory language provides

a clear answer" to the question at issue, the court's task of interpreting the statute ends with the text of the provision).[16] Thus, the unambiguous statutory text of Section 390xx is controlling.

### 1. *43 C.F.R. § 426.15.*

The current version of 43 C.F.R. § 426.15(b) provides that "[i]f a district entered into a contract with Reclamation prior to October 1, 1981, and that contract has provisions addressing [project water and non-project water that use the same facilities], those provisions stay in effect for the term of that contract and any renewals of it." This regulation amounts to a shorthand version of 43 U.S.C. § 390xx, and it ostensibly would apply to validate the provisions of Article 22 in the Implementing Contract. It would fail to do so only if it were construed to contain limitations that are contrary to the statutory text. *See Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 86, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002) ("A regulation cannot stand if it is arbitrary, capricious, or manifestly contrary to the statute." (internal quotation marks omitted)). The court cannot and will not import such limitations.

### 2. *The Department of the Interior's Reclamation Manual.*

 Regulations or interpretations that are not produced through notice-and-comment rule-making may nonetheless be entitled to *Chevron* deference in certain circumstances where they have the force of law. *See Barnhart v. Walton,* 535 U.S. 212, 221–22, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *Mead,* 533 U.S. at 231, 121 S.Ct. 2164. However, in two of its decisions, the Supreme Court has cited "agency manuals" as the foremost example of documents that are not entitled to *Chevron* deference. *See Mead,* 533 U.S. at 234, 121 S.Ct. 2164 (stating that interpretations that are contained in "policy statements, agency manuals, and enforce-

---

**16.** The Supreme Court has noted that "[t]he 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed." *Ardestani v. I.N.S.,* 502 U.S. 129, 135–36, 112 S.Ct. 515, 116 L.Ed.2d 496

(1991) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). Here, the legislative history is manifestly insufficient to constitute the "rare and exceptional circumstance[]" where legislative history can override the plain meaning of the statute.

ment guidelines" are "beyond the *Chevron* pale" (internal quotation marks omitted)); *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). In this instance, there is nothing to distinguish the Department of the Interior's Reclamation Manual from the agency manuals confronted by the Supreme Court in *Mead* and *Christensen.*

 Where an agency's interpretation of a statute that it is responsible for implementing does not merit analysis under *Chevron, Skidmore* deference remains "intact and applicable." *Mead,* 533 U.S. at 237, 121 S.Ct. 2164 (discussing *Skidmore,* 323 U.S. 134, 65 S.Ct. 161); *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 (holding that in cases where "*Chevron*-style deference" is inappropriate, agency interpretations may still be " 'entitled to respect' " (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161)). Under *Skidmore,* an agency's statutory interpretation may be accorded deference on a scale from "great respect" to "near indifference." *Mead,* 533 U.S. at 228, 121 S.Ct. 2164. The level of deference afforded to an agency's interpretation under *Skidmore* varies "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. 161; *see Mead,* 533 U.S. at 228, 121 S.Ct. 2164 (explaining that the "fair measure of deference" depends on "the degree of the agency's care, its consistency, formality, and relative expertness, and ... the persuasiveness of the agency's position"). An agency's manual is not entitled to *Skidmore* deference if it contradicts Congress's unambiguously expressed intent on the issue in question. *See Bull v. United States,* 479 F.3d 1365, 1376 (Fed.Cir. 2007).

The statement in the Department of the Interior's Reclamation Manual explicitly addressing the validation of provisions of contracts entered into before October 1, 1981 has the same general thrust as 43 C.F.R.

§ 426.15(b). The Reclamation Manual states that "[f]or water service or repayment contracts entered into prior to October 1, 1981, the [Reclamation Reform Act of 1982] validates all provisions addressing the commingling of project and non-project water." Pl.'s Ex. AA at 459 (Reclamation Manual at WTR 04–01 § 2(B)(1), Directives and Standards for the Use of Excess Capacity in Reclamation Projects for the Impoundment, Storage, and Carriage of Non–Project Water). As was the case with 43 C.F.R. § 426.15(b), the Reclamation Manual's provision is a shorthand explication of Section 390xx that fails to capture the more-detailed express terms of the statutory text. However, the Reclamation Manual's provision dealing specifically with validation does not contradict the statutory text, and there is no basis to construe the Manual in a manner at odds with the language of 43 U.S.C. § 390xx. In all events, the validation provision in the Manual adds nothing to the statutory text.

Other relevant portions of the Manual do not fare as well. The Bureau's policy for the use of excess capacity for non-project water addresses "[r]evenues generated from the charges accrued ... for the use of excess capacity" by providing that "revenues received by Reclamation from the charges assessed will be covered into the Reclamation Fund, and will not be credited to the project involved." Pl.'s Ex. BB at 465 (Reclamation Manual at WTR P04 § 5(G)(1)). In the same vein, the Bureau's internal directive for the crediting of incidental revenues states that "[r]evenues received from the incidental use of Reclamation project lands and facilities are [f]ederal moneys and are not the property of water districts, power entities, municipalities, or individuals." Pl.'s Ex. CC at 467 (Reclamation Manual at PEC 03–01 § 1(C)). The guidance provided by these portions of the Bureau's Manual manifestly does not take into account, and is inconsistent with, 43 U.S.C. § 390xx. No deference is owed to these provisions of the Manual if, and to the extent that, Section 390xx applies. Where that situation appertains, these portions of the Manual are invalid and can have no effect.

### C. Applicability of 43 U.S.C. § 390xx to Article 22 of the Implementing Contract

The question remains whether Article 22 of Northern Colorado's Implementing Contract with the government has been validated by Section 390xx. For validation to occur, Northern Colorado correctly asserts in its brief that it needs to demonstrate that "the contract was entered into before October 1, 1981 [, that] the contract was between the Secretary of Interior and a district[, and that] the contract provision defines project or nonproject water, or describes the delivery of project water through nonproject facilities or nonproject water through project facilities to lands within the district." Pl.'s Surreply at 8. In this respect, the concluding portion of Article 22 of the Implementing Contract provides that "all revenues derived from the carriage of other than project water though the Continental Divide Tunnel shall be the property of [Northern Colorado]." Pl.'s Ex. A at 28–29 (Implementing Contract Article 22). The government does not challenge Northern Colorado's ability to satisfy the first two prongs of Section 390xx, but it claims that Article 22 does not satisfy the last prong of the statute because "the only thing that describes water is the final sentence of Article 22." *See* Hr'g Tr. 82:15–17.

Northern Colorado satisfies the first two prongs of Section 390xx. The first prong of Section 390xx refers to "[t]he provisions of any contract entered into prior to October 1, 1981." 43 U.S.C. § 390xx. Northern Colorado entered into its Implementing Contract with the Department of the Interior on July 5, 1938. Stip. ¶ 5; Pl.'s Ex. A at 3 (Implementing Contract). Additionally, Northern Colorado's Implementing Contract satisfies the definition of "contract" contained in the Reclamation Reform Act of 1982 because it constitutes a "repayment or water service contract between the United States and a district providing for the payment of construction charges to the United States including normal operation, maintenance, and replacement costs pursuant to [f]ederal reclamation law." 43 U.S.C. § 390bb (definition of "contract"). The Implementing Contract sets forth Northern Colorado's obligation to repay a portion of the Bureau of Reclamation's construction costs, and it also specifies the responsibilities of the respective parties for covering operation and maintenance costs. Pl.'s Ex. A at 10–12 (Implementing Contract Article 6), 15–16 (Implementing Contract Article 9); Stip. ¶¶ 9, 12.

The second prong of 43 U.S.C. § 390xx requires Northern Colorado to demonstrate that its Implementing Contract with the Department of the Interior was "entered into ... by the Secretary with a district." 43 U.S.C. § 390xx. The Implementing Contract "was executed by Oscar L. Chapman, Assistant Secretary of the Interior, on behalf of the United States of America." Stip. ¶ 5; Pl.'s Ex. A at 39 (Implementing Contract). Under the Reclamation Reform Act of 1982, a district is "any individual or any legal entity established under State law which has entered into a contract or is eligible to contract with the Secretary for irrigation water." 43 U.S.C. § 390bb (definition of "district"). Northern Colorado was established following the procedures set forth in the Colorado Water Conservancy Act, *see Northern Colo. Water Conservancy Dist. v. Witwer*, 108 Colo. 307, 116 P.2d 200, 201 (1941) ("The ... district was organized under the Water Conservancy Act."); Stip. ¶ 1,[17] and it has entered into numerous contracts with the Department of the Interior. *See, e.g.*, Pl.'s Ex. A at 3 (Implementing Contract); Pl.'s Ex. X at 391 (Windy Gap Contract); Pl.'s Ex. C at 116 (Loveland Carriage Contract).

Lastly, Northern Colorado must show that Article 22 of the Implementing Contract "de-

---

17. In 1983, the Colorado legislature amended the Water Conservancy Act by enacting Colo.Rev. Stat. § 37–45–153, "which 'validated' and 'recreated' every conservancy district originally organized pursuant to the [1937] Act's procedures." *Taxpayers for the Animas–La Plata Referendum,* 739 F.2d at 1475. Section 37–45–153 of the Colorado Revised Statutes provides that "[t]he following water conservancy districts, originally organized under the provisions of this article, are hereby validated and recreated: ... Northern Colorado Water Conservancy District." Colo. Rev.Stat. § 37–45–153(1). The statutory amendment provided that conservancy districts were to "continue to function in all respects as they did prior to February 23, 1983 [the date of enactment of the amendment]; except that such districts shall be deemed to have been created by statute." *Id.*

fine[s] project or nonproject water, or describe[s] the delivery of project water through nonproject facilities or nonproject water through project facilities to lands within the district." 43 U.S.C. § 390xx. The pertinent portion of Article 22 provides "that all revenues derived from the carriage of other than project water through the Continental Divide Tunnel shall be the property of [Northern Colorado]." Pl.'s Ex. A at 29 (Implementing Contract Article 22). The portion of Article 22 thus "describe[s] the delivery of ... nonproject water through project facilities to lands within the district." 43 U.S.C. § 390xx; Hr'g Tr. 82:2–4. Accordingly, this language from Article 22 satisfies the last requirement of Section 390xx.

Northern Colorado thus has satisfied each of the requirements necessary to apply 43 U.S.C. § 390xx to validate Article 22 of the Implementing Contract. As a result, despite the arguments of the government to the contrary, Article 22 of Northern Colorado's Implementing Contract with the Department of the Interior is valid and enforceable. Thus, "all revenues derived from the carriage of other than project water through the Continental Divide Tunnel shall be the property of [Northern Colorado]." Pl.'s Ex. A at 29 (Implementing Contract Article 22).

### CONCLUSION

For the reasons stated, Northern Colorado's motion for summary judgment is GRANTED IN PART. Article 22 of the Implementing Contract is enforceable, having been validated by Section 225 of the Reclamation Reform Act of 1982, codified at 43 U.S.C. § 390xx. Thus, the government is liable to Northern Colorado for damages associated with the government's failure to honor and give effect to Article 22. Northern Colorado's motion for summary judgment is DENIED IN PART insofar as injunctive relief is concerned. Among other things, Northern Colorado requested that this court "enjoin the United States Bureau of Reclamation from violating Article 22 in the future." Pl.'s Mot. at 2. This suit was brought under Subsection (a) of the Tucker Act, 28 U.S.C. § 1491, and in such a suit the court may enter certain types of equitable relief "as an incident of and collateral to" a monetary judgment. 28 U.S.C. § 1491(a)(2).

Northern Colorado stated that it "will separately seek a determination on the amount of money damages if appropriate." Pl.'s Mot. at 2. Thus, consideration of equitable relief is premature because there is no accompanying monetary judgment. The only equitable relief that the court may consider at this time is an accounting, *see Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483, 490–91 (1966) (stating that once liability has been established, "the court has the power to require an accounting in aid of its jurisdiction to render a money judgment on [a] claim"); *see also The American Indians Residing on Maricopa–Ak Chin Reservation v. United States,* 229 Ct.Cl. 167, 667 F.2d 980 (1981) (same), because that relief in a case such as this is a necessary precursor to an award of damages. In all events, to support any equitable relief beyond an accounting, Northern Colorado would have to show that a remedy at law, *i.e.,* an award of damages, would not be adequate. The government's cross-motion for summary judgment is DENIED.

Preparatory steps for a resolution of damages shall be undertaken. In accord with RCFC Appendix A ¶¶ 3 & 4, the parties are directed to confer and to file a joint status report by October 19, 2009, addressing steps to perform an accounting and otherwise to develop an appropriate quantum of damages.

It is so ORDERED.